UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 3:20CV223 |
| | : | |
| ONE PARCEL OF PROPERTY LOCATED | : | |
| AT 112 SHORE ROAD, OLD | : | |
| GREENWICH, CONNECTICUT | : | |
| WITH ALL APPURTENANCES AND | : | |
| IMPROVEMENTS THEREON, | : | |
| | : | |
| Defendant. | : | February 18, 2020 |
| | : | |
| [CLAIMANTS: MICHAEL LONSKI, | : | |
| EVELYN LLEWELLEN, AND | : | |
| JP MORGAN CHASE BANK] | : | |

**VERIFIED COMPLAINT OF FORFEITURE**

Plaintiff, United States of America, by its attorneys, John H. Durham, United States

Attorney for the District of Connecticut, and Julie G. Turbert, Assistant United States Attorney,

brings this complaint and alleges as follows in accordance with Supplemental Rule G(2) of the

Federal Rules of Civil Procedure:

**NATURE OF ACTION**

1.      This is a civil action in rem brought to enforce the provision of 18 U.S.C.

§ 981(a)(1)(A) for the forfeiture of property involved in a financial transaction in violation of 18

U.S.C. § 1956 or 1957, or to enforce the provision of 18 U.S.C. § 981(a)(1)(C) for the forfeiture

of property which constitutes or is derived from proceeds traceable to an offense constituting

"specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), namely wire fraud in violation of 18 U.S.C. § 1343, or conspiracy to commit such offense.

## THE DEFENDANTS IN REM

2.      The defendant property is one parcel of property located at 112 Shore Road, Old Greenwich,  Connecticut, with all appurtenances and improvements thereon (defendant property), more particularly described in Exhibit A, which is attached hereto and incorporated herein by reference.

3.      The record owners of the defendant property are Michael Lonski and Evelyn Llewellyn.

4.      The defendant property is owner occupied residential property.

5.      The defendant property was acquired by Michael Lonski and Evelyn Llewellyn from Eva C. Griggs for $750,000 by warranty deed, dated September 3, 1996 and recorded September 5, 1996, in Volume 2830, at Page 66 in the Greenwich Land Records.

6.      JP Morgan Chase Bank may have an interest in the defendant property by virtue of a mortgage in the original principal amount of $1,400,000.00, dated November 23, 2015, and recorded December 10, 2015, in Volume 6996, at Page 280 of the Greenwich Land Records.

7.       JP Morgan Chase Bank may also have an interest in the defendant property by virtue of a mortgage (home equity line of credit) in the original principal amount of $100,000.00, dated May 1, 2014, and recorded May 13, 2014, in Volume 6737, at Page 133, and a Subordination of Mortgage recorded on December 10, 2015, in Volume 6996, at Page 297 of the Greenwich Land Records.

8.      The defendant property has a fair market value of approximately $3,335,000.00.

9.      The defendant property has not been seized and is located within this district.  The United States does not request authority from the Court to seize the defendant property at this time. The United States will, as provided by 18 U.S.C. § 985(b) (1) and (c) (1):

     a.      post notice of this action and a copy of the Complaint on the defendant property, and

     b.      serve notice of this action on the defendant property owner, and any other person or entity who may claim an interest in the defendant, along with a copy of this Complaint, and

     c.      execute a writ of entry for purposes of conducting an inspection and inventory of the property, and

     d.      file a lis pendens in Greenwich, Connecticut Land Records of the defendant property's status as a defendant in this in rem action.

The United States will also, as provided in 19 U.S.C. § 1606, appraise the defendant property when it executes the Writ of Entry.

## JURISDICTION AND VENUE

10.     Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States pursuant to 28 U.S.C. § 1345, and over an action for forfeiture pursuant to 28 U.S.C. § 1355(a).

11.     This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. 1355(b).

12.   Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1), because the acts or omissions giving rise to the forfeiture occurred in this district, and pursuant to 28 U.S.C. § 1395, because the property is located in this district.

## BASIS FOR FORFEITURE

13.   The defendant property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it constitutes property involved in a financial transaction in violation of 18 U.S.C. § 1956 or 1957, or pursuant to 18 U.S.C. § 981(a)(1)(C) because it constitutes or is derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), namely wire fraud in violation of 18 U.S.C. § 1343, or conspiracy to commit such offense.

## BACKGROUND ON HEALTH CARE PROVIDER BILLINGS

### The Medicare Program

14.   The Medicare program ("Medicare") is a federal health care program providing benefits to persons who are over the age of 65 or disabled. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), administers Medicare. Medicare is a "health care benefit program" as defined by 18 U.S.C. § 24(b).

15.   To enroll in Medicare, all health care providers are required to submit a Medicare enrollment application to CMS certifying that they understand and will abide by the federal laws and regulations governing Medicare. Once approved, a provider may file claims with Medicare to obtain reimbursement for services provided to beneficiaries (patients who qualify for Medicare benefits). A Medicare claim is required to set forth, among other things, the beneficiary's name,

services that were performed, the date the services were provided, the cost of the services, and the provider's name and identification number.

16.     Every approved provider receives a unique provider number to use in submitting reimbursement claims which allow Medicare to tie a particular provider to a particular claim. Each time a provider submits a claim to Medicare (typically electronically), the provider certifies that the claim is true, correct and complete, and complies with all Medicare laws and regulations.

17.     Michael Lonski (**Lonski**) originally enrolled as a Medicare provider in 1982. In or around 2002, **Lonski** was sued by the United States in the U.S. District Court, Southern District of New York in *United States v. Michael Lonski et al.*, Case No. 02 Civ 8690, for submitting knowingly or recklessly false billings to Medicare. Those billings were alleged to have included: excessive numbers of services per patient; higher levels of service than those actually provided; nonreimbursable group therapy sessions; multiple visits by a given patient in a single day; and services rendered on an excessive number of days in a given year. **Lonski** entered a settlement of the case, effective as of October 2002, in which he agreed to pay $4,000,000 to the United States in restitution and was excluded from participating in the Medicare program from April 2003 to November 2007.

18.     **Lonski** was reinstated to the Medicare program in or around December 2008. In October of 2015, **Lonski** revalidated his Medicare enrollment information indicating his practice location as the defendant property, effective December 4, 2008, and indicating that his payment address was the defendant property, effective January 14, 2009. In December 2017, **Lonski** revalidated his Medicare enrollment information and listed the correspondence address and

practice location as the defendant property as of December 4, 2008, and confirmed that current

and former medical records were stored at the practice location.

19.    Evelyn Llewellyn (**Llewellyn**) enrolled as a Medicare provider on September 1,

2000.  In August of 2015, **Llewellyn** revalidated her Medicare enrollment information and listed

her correspondence address and practice location as the defendant property effective July 1,

2015.  Llewellyn's enrollment application listed **Lonski** at the defendant property as the contact

person, and **Lonski**'s email address (mlonski@optonline.net) was listed under the authorized

signer for Evelyn **Llewellyn**.

### The Medicaid Program in Connecticut

20.     The Connecticut Department of Social Services ("DSS") is a multi-faceted health

and human services agency in Connecticut that, among other things, oversees and supports

programs providing medical assistance to low-income persons through the Connecticut Medical

Assistance Program ("CTMAP").  CTMAP offers a comprehensive set of health care benefit

programs including HUSKY A (Family Medicaid); HUSKY B (State Children's Health Insurance

Program); HUSKY C (previously referred to as Adult Medicaid); and HUSKY D (previously

referred to as Medicaid for Low Income Adults) (collectively, "Medicaid"). Medicaid is a joint

federal-state program, funded 50-50 by the federal government and the State of Connecticut.

21.     Medicaid pays claims submitted by participating health care providers for

medically necessary benefits, items, and services rendered to Medicaid clients. As such, Medicaid is

a "health care benefit program" under 18 U.S.C. § 24(b).

22.    **Lonski** has been enrolled in the Medicaid program since January 2009 as a

behavioral health clinician in the specialty of psychology. In his enrollment and re-enrollment

documents, **Lonski** reported that he was a sole proprietor with no employees. **Lonski** re-enrolled in Medicaid 2013 and in 2018, listing his service location address, mailing address, home office address, check and remittance advice address, IRS Form 1099 address, and enrollment address as 112 Shore Road, Old Greenwich, the defendant property.

23.     **Llewellyn** has been enrolled in the Medicaid program since November 2014 as a behavioral health clinician in the specialty of psychology. **Llewellyn**'s enrollment paperwork listed her service location as the defendant property and her home office email contact as mlonski@optonline.net.

### Private Health Insurance Companies

24.     Several private health insurance companies, including Anthem Blue Cross and Blue Shield ("Anthem"), Cigna, Aetna, and UnitedHealthCare (UHC) have operations in Connecticut. These health care benefit programs pay claims for medical services provided to their insured clients submitted by registered, also known as "participating," health care providers, as well as out-of-network, non-participating providers. As such, these programs constitute "health care benefit programs" under 18 U.S.C. § 24(b). **Lonski** and **Llewellyn** are participating health care providers for UHC and non-participating providers for Anthem, Cigna, and Aetna.

25.     In order to be a participating provider for UHC, **Lonski** submitted an initial provider credentialing application in 2013, and he recredentialed with UHC in 2016.[1] **Lonski** listed his primary practice location, billing contact address, and payment and remittance address as the defendant property, and listed himself as the contact for the office and for billing. **Lonski**

_____

[1] **Lonski** did not submit the type of provider application he submitted to UHC to Anthem, Cigna, or Aetna because he is a non-participating provider for those health care benefit programs.

indicated it was a solo practice and that **Llewellyn** was a partner/associate of the practice. **Lonski** indicated he had electronic billing capabilities.

26.     **Llewellyn** is a participating health care provider with UHC and submitted her initial provider credentialing application to UHC in 2009 and recredentialed in 2015 and 2018. Upon recredentialing in 2018, **Llewellyn** listed her primary practice location as Elder Psychological Solutions, PC located at the defendant property. The Office Manager/Business Office Staff Contact and Billing Contact was listed as Michael **Lonski**, mlonski@optonline.net. **Llewellyn** indicated it was a solo practice and did not list any partners or associates.

## **PROBABLE CAUSE**

### **Lonski and Llewellyn Claims Data Shows Fraudulent Overbilling**

27.     The Federal Bureau of Investigation (FBI) began an investigation into **Lonski** and **Llewellyn**'s billing practices. The FBI has reviewed[2] claims data submitted under **Lonski** and **Llewellyn**'s names and provider numbers to Medicaid, Medicare, Anthem, Cigna, Aetna, and UHC for dates of service spanning multiple years, primarily between 2014 and 2019, as follows:

| | |
|---|---|
| Aetna | 10/18/15 – 07/19/19 |
| Anthem | 01/01/14 – 02/21/19 |
| Cigna | 01/02/14 – 12/31/18 |
| Medicaid | 01/01/14 – 05/08/19 |
| Medicare | 01/01/14 – 02/28/19 |
| UHC | 01/01/14 – 07/17/19 |

---

[2] The FBI also reviewed a December 26, 2017 DSS referral to Health and Human Services – Office of Inspector General (HHS-OIG), Medicaid Fraud Control Unit (MFCU) of the Connecticut Chief State's Attorney's Office, and the Attorney General's Office (AGO) for consideration of a possible fraud investigation of Medicaid claims submitted by **Lonski** and **Llewellyn** for dates of service October 1, 2014 to October 31, 2017.

These claims are hereinafter referred to as the "**Lonski Claims**" when referring to claims submitted under **Lonski**'s provider number and as the "**Llewellyn Claims**" when referring to claims submitted under **Llewellyn**'s provider number.[3]

28.     In order to obtain reimbursement from Medicaid and other health insurance programs, providers use a five-digit number, known as a CPT code which identifies the particular service provided. Some CPT codes for psychotherapy services and health and behavior intervention services represent face-to-face time and a provider of these services is required to bill the CPT code closest to the actual time spent with a patient. For example, the CPT code for a 30 minute psychotherapy session requires a minimum face-to-face time of 16 minutes up to 37 minutes, and the CPT code for a 45 minute psychotherapy session requires a minimum face-to-face time of 38 minutes up to 52 minutes, and the CPT code for a 60 minute psychotherapy session requires a minimum face-to-face time of 53 minutes or more.  For this reason, **Lonski Claims** and **Llewellyn Claims** for timed psychotherapy services and behavior intervention services represent to an insurer a particular number of face-to-face hours worked.[4]

29.     For the three year period October 1, 2014 to October 31, 2017, with respect to Medicaid claims, the most frequently used CPT code by **Lonski** and **LLewellyn** was for 60 minutes of psychotherapy. Amongst Connecticut Medicaid providers during that period, **Lonski**

---

[3] The time period of claims included for analysis in this complaint necessarily lags behind the current date for several reasons. First, **Lonski** and **Llewellyn** take time, often months, to submit claims to insurers, who, in turn take additional time to process submitted claims. Insurers require varying amounts of time to respond to subpoena requests, and when that information is finally produced to the investigative team, its volume and format require a substantial amount of time to process and analyze.

[4] In calculating the number of hours worked, the minimum required amount of time for any particular session was used in the calculation. The **Lonski Claims** and **Llewellyn Claims** also routinely included billing for non-timed services (such as follow-up visits to a nursing home), however, these non-timed services were not included in the analysis of the number of hours worked on any particular day.

ranked first out of 1,912 Connecticut behavioral health clinicians for the amount paid for that CPT code, while **Llewellyn** ranked third.

30.      The **Lonski Claims** and **Llewellyn Claims** demonstrate that **Lonski** and **Llewellyn** have engaged in health care fraud by billing Medicaid, Medicare, Anthem, Cigna, Aetna, and/or UHC for services that they did not actually perform and/or with codes that falsely inflate the services rendered such that the health care programs paid **Lonski** and **Llewellyn** at a higher rate.  Among other things, those claims show that **Lonski** and **Llewellyn** billed for excessive days and hours (such that it was highly unlikely or even impossible that they performed the billed services), billed for deceased patients, and billed for dates of service when they were out of the country. These billing practices, along with a shift in **Lonski** and **Llewellyn**'s Medicaid billing practices to reflect the wrong place of service, resulted in payments to **Lonski** and **Llewellyn** to which they were not entitled.

### #1: Billing for More Than 24 Hours in a Day and for Excessive Hours

*Lonski's Excessive Hours*

31.      The **Lonski Claims** show 765 dates of service on which **Lonski** claimed to have provided a minimum of 12 hours of timed psychotherapy and/or health and behavior intervention services in a single day. Of those, there were 39 dates of service on which **Lonski** claimed to have provided over 24 hours of psychotherapy and/or health and behavior intervention services in a single day, including the following:

      a.      For a date in September 2016, **Lonski's Claims** included billings for 46 different patients, claiming to have provided a minimum of 29 hours of timed

psychotherapy services to 36[5] of these patients at various locations, including the defendant property in Old Greenwich, a skilled nursing facility in Greenwich, Connecticut, and a skilled nursing facility in Danbury, Connecticut located about 35 miles from the defendant property.

b.      For a date in September 2017, **Lonski's Claims** included billings for 39 different patients, claiming to have provided a minimum of 29 hours of timed psychotherapy services to 36 of these patients at various locations including the defendant property in Old Greenwich, an inpatient hospital, and a skilled nursing facility in Greenwich, Connecticut located approximately 10 miles from the defendant property. As described below, two of the beneficiaries were deceased on the dates they supposedly received psychotherapy services from **Lonski**, one (with initials "H.S.") having died on June 30, 2017, and another (with initials "W.V.") having died on November 17, 2016.

c.      For a date in June 2018, **Lonski's Claims** included billings for 44 different patients, claiming to have provided a minimum of 32 hours of timed psychotherapy and/or health and behavior intervention services to 43 of these patients at various locations, including the defendant property in Old Greenwich and the skilled nursing facility in Danbury, Connecticut located approximately 35 miles away.

d.      For a date in August 2018, **Lonski's Claims** included billings for 44 different patients, claiming to have provided a minimum of 31 hours of timed psychotherapy and/or health and behavior intervention services to these patients at

---

[5] The **Lonski Claims** included billings for non-timed services for the other 10 patients which were not included in the calculation described herein.

various locations including the **Target Premises** in Old Greenwich and the skilled

nursing facility in Danbury, Connecticut, approximately 35 miles away.

*Llewellyn's Excessive Hours*

32.     The **Llewellyn Claims** show 166 dates of service on which Llewellyn claimed to

have provided at least 12 hours of timed psychotherapy and/or health and behavior intervention

services in a single day. Of those, **Llewellyn** billed for more than 24 hours of services for a

single day on three occasions. For example:

a.   For a date in January 2017, **Llewellyn's Claims** included billings for 28 different

patients, claiming that Llewelyn provided at least 25 hours of timed

psychotherapy services to these patients at the defendant property and at a skilled

nursing facility. One of the 28 patients, W.V., was deceased at the time.

b.   For a date in January 2017, **Llewellyn's Claims** included billings for 30 patients,

claiming that Llewellyn provided at least 25 hours of timed psychotherapy

services to 28 of these patients at the defendant property and at a skilled nursing

facility.  W.V. was again one of the patients.

c.   For a date in March 2017, **Llewellyn's Claims** included billings for 34 patients,

claiming that Llewellyn provided at least 29 hours of timed psychotherapy

services to these patients at the defendant property and at the skilled nursing

facility in Danbury, approximately 35 miles away. W.V. was again one of the

patients.

### #2: Billing on Excessive Service Days

33.     The sheer number of days for which the **Lonski Claims** and **Llewellyn Claims** sought reimbursement raises suspicion that **Lonski** and **Llewellyn** billed for services that they did not perform. The **Lonski Claims** show that for five-year period from January 1, 2014 through May 25, 2019,[6] **Lonski** claimed to have provided services every single day, including weekends and holidays, except for a single day, August 21, 2017 (a day for which, as described below, U.S. Customs and Border Protection records show that **Lonski** was out of the country).

34.     **Lonski** billed claims for services rendered on 285 Saturdays, which included every Saturday between January 1, 2014, and May 25, 2019. **Lonski** billed claims for 287 Sundays, which included every Sunday between January 1, 2014 and June 2, 2019.

35.     **Llewellyn** billed claims for 265 Saturdays and 145 Sundays.

36.     **Lonski's Claims** included billings for services supposedly rendered on nearly every holiday, including, for example, New Year's Day for every year between 2014 and 2019, on Fourth of July every year for 2014 through 2019, on Thanksgiving Day every year for 2014 through 2018, and on October 11, 2014, the day of **Lonski** and **Llewellyn**'s daughter's wedding. **Llewellyn's Claims** included billings for services on Thanksgiving Day 2016 and 2018 and on the day of **Lonski** and **Llewellyn**'s daughter's wedding on October 11, 2014.

---

[6] Although the **Lonski Claims** included additional days after May 25, 2019 on which no claims were submitted, most of the insurer data did not extend that far in time (see paragraph 33). It therefore could not be determined past May 25, 2019 whether any additional "no billing" days were because there were no billings or because the insurers had not yet provided the data.

### **#3: Lonski and Llewellyn's Billing for Deceased Patients**

37.    The inclusion of multiple billings for patients who were deceased at the purported time of service also supports probable cause to believe **Lonski** and **Llewellyn** billed for services they did not actually provide. The **Lonski Claims** included billings for 71 patients who were deceased on the date services were purportedly provided. For example:

a.   According to Medicare's records, a patient with initials "M.M." died on June 30, 1971, but the **Lonski Claims** included Medicare billings for M.M. for five separate dates of service between July 4, 2017, and July 21, 2017.

b.   According to Medicaid's records, a patient with initials "L.R." died on March 2, 2017, but the **Lonski Claims** included Medicaid billings for L.R. for 19 dates of service from March 9, 2017, to June 20, 2017.

c.   The **Lonski Claims** included a September 2, 2017, billing for a patient with initials "H.S." who, according to Medicaid records, died on June 30, 2017, and for patient with initials "W.V." who, according to Medicaid records, died on November 17, 2016. The **Lonski Claims** also included Medicaid billings for W.V. for another four dates of service from August 29, 2017, to September 7, 2017.

38.    The **Llewellyn Claims** included billings for six patients who were deceased on the date services were purportedly provided. For example:

a.   According to Medicaid's records, the **Llewellyn Claims** included Medicaid billings for W.V. for 37 dates of service from November 18, 2016, to April 29, 2017 (all post-dating W.V.'s death on November 17, 2016).

14

b.   According to Medicaid's records, a patient with initials "M.D." died on June 9, 2016, but the **Llewellyn Claims** included Medicaid billings for M.D. for six dates of service from June 13, 2016, to July 18, 2016.

### #4: Billing for Dates While Out of the Country

39.   The FBI examined U.S. Customs and Border Protection records showing travel by **Lonski** outside of the United States in 2015, 2016, 2017, and 2018, and compared those dates to the information in the **Lonski Claims**. That analysis shows multiple dates on which **Lonski** billed for services supposedly rendered while he was out of the country as follows:

| Departure Date | Arrival Location | Return Date | Dates of Claimed Service | Claimed Service Locations[7] | Number of Patients Claimed[8] |
|---|---|---|---|---|---|
| 09/16/15 | Paris | 09/27/15 | 09/16/15 – 09/27/15 | office; SNF; nursing facility; hospice | 55 |
| 09/22/16 | Paris | 10/2/16 | 09/22/16 – 10/02/16 | office; SNF; nursing facility; inpatient hospital | 26 |
| 03/04/17 | Bermuda | 03/07/17 | 03/04/17 – 03/07/17 | office; SNF | 32 |
| 08/17/17 | London | 08/24/17 | 08/17/17-08/20/17; 08/22/17-08/24/17 | office; SNF | 11 |
| 06/01/18 | Reykjavik | 06/05/18 | 06/01/18 – 06/05/18 | office; SNF; inpatient hospital | 65 |
| 08/17/18 | Ireland | 08/25/18 | 08/17/18 – 08/25/18 | office; SNF; inpatient hospital | 63 |
| 10/04/18 | Paris | 10/14/18 | 10/04/18 – 10/14/18 | office; SNF; inpatient hospital | 78 |

---

[7] Claimed service locations include "office" for the defendant property, "SNF" indicating a skilled nursing facility, and billings for nursing facility, hospital or hospice.

[8] These numbers do not include claims for services purportedly having been provided on **Lonski** and **Llewellyn**'s departure and return dates.

40.     Similarly, the **Llewellyn Claims** include billings for services supposedly rendered while **Llewellyn** was out of the country as follows:

| Departure Date | Arrival Location | Return Date | Dates of Claimed Service | Claimed Service Locations | Number of Patients Claimed |
|---|---|---|---|---|---|
| 09/16/15 | Paris | 09/27/15 | 09/19/15 | office | 2 |
| 09/22/16 | Paris | 10/02/16 | 09/22/16; 09/25/16; 09/26/16; 09/29/16; 09/30/16; 10/01/16; 10/02/16 | office; SNF | 5 |
| 03/04/17 | Bermuda | 03/07/17 | 03/04/17-03/07/17 | office; SNF | 20 |
| 08/17/17 | London | 08/24/17 | 08/17/17; 08/20/17; 08/24/17 | office | 1 |
| 06/01/18 | Reykjavik | 06/05/18 | 06/01/18; 06/02/18; 06/04/18; 06/05/18 | office | 5 |
| 08/17/18 | Ireland | 08/25/18 | 08/18/18; 08/19/18; 08/22/18; 08/23/18; 08/25/18 | office; SNF | 2 |
| 10/04/18 | Paris | 10/14/18 | 10/04/18; 10/05/18; 10/10/18; 10/12/18; 10/13/18; 10/14/18 | office; SNF | 4 |

### #5: Incorrect Place of Service

*Lonski's Claims*

41.     Based upon the FBI's review of the **Lonski Claims**, **Lonski** dramatically changed his billing pattern to reflect services rendered at his office (rather than in a skilled nursing facility) in order to take advantage of a change in Medicaid reimbursement rates, regardless of where the services were actually rendered (assuming such services were rendered at all).

42.     On October 1, 2014, the Connecticut Medical Assistance Program reduced the reimbursement rate paid for Medicaid services in a facility setting (such as a skilled nursing facility), but left the rate paid for place of service office the same. As a result, after October 1,

16

2014, services provided in a skilled nursing facility were entitled to only about half the reimbursement rate of what the same services were allowed if provided in an office setting.

43.     Before this rule change, from January 1, 2014 to September 30, 2014, the **Lonski Claims** included over 1600 claims to Medicaid and only a single claim was designated with the place of service being "office." Starting on October 1, 2014, **Lonski** changed this billing pattern dramatically. From October 1, 2014 to May 8, 2019, the **Lonski Claims** included almost 14,600 claims to Medicaid, and almost 10,900 of them or 75 percent of them were designated with the place of service as "office."

44.     By submitting these Medicaid claims with place of service designated as "office," **Lonski** was representing that he provided treatment at the defendant property. However, information from Medicaid indicates that in many cases, this representation as to place of service was false. Medicaid authorization data shows that 92 patients who **Lonski** claimed to have treated in his office were residing in a nursing home at the time of service, and 39 patients were inpatients at a hospital or hospice at the purported date of service.

*Llewellyn's Claims*

45.     The Medicaid billings in **Llewellyn's Claims** also show multiple claims for services provided at the "office" when Medicaid authorization data indicates that at the time of service, 32 patients were admitted in a hospital/hospice and 70 patients were in a nursing home facility.

## Relevant Background of the Defendant Property

46.     Michael Lonski and Evelyn Llewellyn purchased the single family home at 112 Shore Road, Old Greenwich Connecticut on September 3, 1996 for $750,000 with a $600,000

mortgage. They have refinanced their mortgages ten times. There are currently two outstanding mortgages on the property; a first mortgage in the amount of $1,400,000 with JP Morgan Chase Bank dated November 23, 2015, and a home equity line of credit up to $100,000 with JP Morgan Chase Bank dated May 1, 2014.

47.     On October 24, 2013, Michael Lonski and Evelyn Llewellyn refinanced their existing mortgage on the defendant property with JP Morgan Chase Bank (Chase) for a $1,067,200 adjustable rate mortgage. They authorized Chase to deduct the mortgage and tax escrow payment from Chase checking account ending in 9202 in the name of Michael Lonski or Evelyn Llewellyn.

48.     On November 23, 2015, Michael Lonski and Evelyn Llewellyn refinanced that mortgage on the defendant property with Chase for a $1,400,000 fixed rate mortgage. They authorized Chase to deduct the mortgage and tax escrow payments from Chase checking account ending in 9202 in the name of Michael Lonski or Evelyn Llewellyn.

49.     From September 12, 2014, through January 11, 2019, there were approximately 49 mortgage payments totaling approximately $419,064.75 transferred from the Chase checking account ending in 9202.  As of March 7, 2019, the outstanding balance of this first mortgage was $1,315,061.52

50.     From September 12, 2014, through January 11, 2019, there were approximately three payments to the home equity line of credit totaling approximately $51,868.12 from the Chase checking account ending in 9202. Additionally, there were five checks from Aetna and one check from Anthem totaling approximately $19,010.87 payable to Lonski and two checks from Cigna totaling approximately $6,661.44 payable to Llewellyn which were directly applied

to the balance of the home equity line of credit. The outstanding balance of the home equity line of credit was $40,226.14 as of March 12, 2019.

**Insurance Payments transferred to Chase Account used for Mortgage Payments**

51.     Medicare, Medicaid and private insurance payments for most of the billings by Michael Lonski were deposited into Patriot Bank checking account ending in 6008 in the name of Michael W. Lonski PHD. The approximate total amount of those deposits was $149,299.78 in 2014, $568,508.64 in 2015, $735,871.54 in 2016, $818,971.16 in 2017, $890,889.75 in 2018, and $18,155.78 through January 31, 2019.

52.     Medicare, Medicaid and private insurance payments for most of the billings by Evelyn Llewellyn were deposited into Patriot Bank checking account ending in 1710 in the name of Evelyn Llewellyn, PsyD. The approximate total amount of those deposits was $58,096.97 in 2015, $238,820.07 in 2016, $413,938.42 in 2017, $328,450.09 in 2018, and $29,664.63 through January 31, 2019.

53.     Deposits representing false billing as well as legitimate billing were comingled into Patriot bank checking accounts ending in 6008 and 1710.

54.     From September 12, 2014, through January 11, 2019, there were approximately 44 transfers of funds totaling approximately $375,500 from the Michael W. Lonski PHD Patriot Bank checking account ending in 6008 to JP Morgan Chase Bank checking account ending in 9202 in the name of Michael Lonski or Evelyn Llewellyn. Most of the transfers were by check in round numbers slightly higher than their monthly mortgage payment. For example, when their mortgage payment was $7,722.40 in 2015, there would be a deposit of $7,800, $7,900, $8,000, or $8,500 shortly before the mortgage payment was made. Some of the checks had the word

"mortgage" in the memo section. Additionally, there were private insurance payments totaling approximately $78,018 which were deposited into JP Morgan Chase Bank checking account ending in 9202 in the name of Michael Lonski or Evelyn Llewellyn. These deposits included two checks from Cigna and one check from Meritain Health, an Aetna Company, totaling approximately 466,066 payable to Lonski and one check from Meritain Health, an Aetna Company, for approximately $11,952 payable to Llewellyn.

55. From October 1, 2014, through January 31, 2019, there were approximately 17 transfers of funds totaling approximately $227,755.20 from the of Evelyn Llewellyn, PsyD Patriot Bank checking account ending in 1710 to the Michael W. Lonski PHD Patriot Bank checking account ending in 6008. Most of the transfers were by check. Some of the checks had notations in the memo section indicating it was for credit card payments, one said "Taxes mortgage."

<u>**CONCLUSION**</u>

56. The defendant property was involved in a transaction or attempted transaction, or traceable thereto, in violation of 18 U.S.C. §§ 1956 and 1957, or represents property which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A); or that they constitute or are derived from proceeds traceable to an offense constituting "specified unlawful activity" (as defined in 18 U.S.C. § 1956(c)(7)), namely wire fraud in violation of 18 U.S.C. §1343, and is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

WHEREFORE, the United States of America respectfully asserts that there is reasonable belief that the defendant property is subject to forfeiture to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A) or (C); and requests

(a)  that pursuant to 18 U.S.C. § 985(b)(2), and 18 U.S.C. § 981(j), which permits the Court to "take any action to . . . preserve the availability of the property subject to civil forfeiture," the Court issue the proposed Writs of Entry submitted with this Verified Complaint of Forfeiture authorizing the United States Marshals Service, or its delegate, to enter the  Real Property Defendant, including any structures, on one or more occasions during the pendency of this in rem forfeiture action:

(1)      for the purpose of conducting an inspection and inventory and appraisal of the defendant property, which inspection and inventory and appraisal may include still and video photography;

(2)       to be accompanied on any such occasion by any appraiser(s) selected by it to appraise the condition and value of the defendant property pursuant to 19 U.S.C. § 1606;

(3)      to be accompanied on any such occasion by any government or contract personnel selected by it for the purpose of conducting an inventory of the defendant property; and

(4)      to be accompanied on any such occasion by any federal, state, or local law enforcement officers selected by it to ensure the safety of any person acting under the Writ of Entry.

21

(b)  that the Court decree that the forfeiture of the property defendant to the United States under 18 U.S.C. §§ 981(a)(1)(A) or (C) is confirmed, enforced, and ordered;

(c)  that the Court thereafter order that the United States Marshal, or his delegate, dispose of the property defendant as provided by law; and

(d) that the Court award Plaintiff United States all other relief to which it is entitled, including the costs of this action.

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY


_/s/ Leonard C. Boyle_
LEONARD C. BOYLE
FIRST ASSISTANT
UNITED STATES ATTORNEY


_/s/ Julie G. Turbert_
JULIE G. TURBERT
ASSISTANT U.S. ATTORNEY
ATTORNEY BAR # ct23398
157 CHURCH STREET
NEW HAVEN, CT  06510
TELEPHONE:  (203) 821-3700
FAX: (203) 773-5373
EMAIL:  Julie.Turbert@usdoj.gov

<u>DECLARATION</u>

I am a Special Agent of the Federal Bureau of Investigation, United States Department of Justice, and the agent assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of February, 2020.


_____*/s/ Jennifer A. Boyer*_____
JENNIFER A. BOYER
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Tax Id Number(s): 443/012

Land Situated in the Town of OLD GREENWICH in the County of Fairfield in the State of CT

ALL THAT CERTAIN TRACT, PIECE OR PARCEL OF LAND, WITH THE BUILDINGS AND IMPROVEMENTS THEREON. SITUATED IN TOWN OF GREENWICH; AT OLD GREENWICH, BEING KNOWN

AND DESIGNATED AS LOT NO. 2 ON A CERTAIN MAP ENTITLED "MAP OF PROPERTY OF EST. OF JOHN FERRIS

AT SOUND BEACH, GREENWICH, CONN." MADE BY F. S. ODELL, CIVIL ENGINEER, PORT CHESTER, N.Y., JULY,

1904, WHICH MAP IS ON FILE IN THE OFFICE OF THE TOWN CLERK OF SAID GREENWICH AND THEREIN NUMBERED 23 7.

SAID PREMISES ARE BOUNDED NORTHERLY ON A COURSE RUNNING SOUTH 61° 02' EAST 222.84 FEET BY LOT

NO. 1 ON SAID MAP, EASTERLY 79.04 FEET BY A DRIFTWAY INDICATED ON SAID MAP, SOUTHERLY ON A COURSE RUNNING SOUTH 61° 02' EAST 246.3 FEET BY LOTS NOS. 3 AND 5 ON SAID MAP, AND WESTERLY ON A

COURSE RUNNING NORTH 44° 27' EAST 82 FEET BY THE HIGHWAY KNOWN AS SHORE ROAD. TOGETHER WITH ALL RIGHT, TITLE AND INTEREST OF THE GRANTOR IN AND TO THE HIGHWAY, SHORE ROAD, IN FRONT OF AND ADJOINING SAID PREMISES TO THE CENTER LINE THEREOF.

TOGETHER WITH ANY RIGHTS WHICH THE GRANTOR MAY HAVE IN OR TO SAID DRIFTWAY BOUNDING SAID

PREMISES ON THE EAST AND IN OR TO THE WATERS OF LONG ISLAND SOUND.
Parcel ID: 06-2975/S

Commonly known as:   112 Shore Rd , Old Greenwich, CT 06870-2214



GOVERNMENT EXHIBIT